George T. McLean and Amelia G. McLean v. Commissioner.
McLean v. Commissioner
Docket No. 73352.
United States Tax Court
T.C. Memo 1960-128; 1960 Tax Ct. Memo LEXIS 162; 19 T.C.M. (CCH) 673; T.C.M. (RIA) 60128; June 16, 1960
T. Howard Spainhour, Esq., for the petitioners. Charles C. Shaw, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined a deficiency in petitioners' income tax for the year 1953 in the amount of $7,929.86. The sole issue for decision is whether petitioners were engaged in a trade or business of breeding, training and showing horses during 1953 with the result that they may claim a deductible loss therefrom in the amount of $12,548.98. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. George T. McLean and Amelia G. McLean, hereinafter referred to as petitioners, are husband and wife, residing at 204 Gannon Road, Green Acres, Portsmouth, Virginia. They filed a *163 joint return for 1953 with the district director at Richmond, Virginia. George T. McLean, hereinafter referred to as petitioner, has been actively engaged in a number of business enterprises for many years. During the year 1953, the sources of his income included a building material business, a ready-mix concrete business, an asphalt paving business, and a home construction business. In their income tax return for the year 1953, the petitioners reported a net farm loss of $12,548.98 resulting from reported income of $6,054.13 from the farming activity and expenses of $18,603.11. The petitioner's daughter Jean, now Jean McLean Davis, sometimes hereinafter called Jean, become interested in horses in 1930 when she was only two years old. To satisfy her interest at that time the petitioner bought her a pony. As Jean grew older the petitioner bought more ponies for her and purchased a farm in order that his family could have more room in which to enjoy the animals. In 1937, when Jean was about nine years old, the petitioner bought several types of ponies and horses. With a number of horses and ponies available, the petitioners derived considerable personal entertainment from them. *164 In addition, the children of friends would visit the farm to ride the horses and ponies. During 1939 the petitioner bought two show ponies, "King Bee" and "Two Step," for his daughter. These two show ponies were entered in national pony shows all over the eastern part of the United States from Madison Square Garden in New York City to Miami, Florida, and as far west as Louisville, Kentucky. Jean won several honors with the ponies during the 1939 tour and other tours that followed and she developed a degree of skill in riding that was unusual for a child. In 1942 when Jean was 12 years old, the petitioner bought her a mare by the name of "Mighty Fine." This was the first show horse the petitioner bought that later became a world champion. From 1940 through 1952 the petitioner also purchased and sold or otherwise disposed of the following show horses: Year
Year Sold or
Name of Horse
Purchased
Disposed of
Gay Parader
1940 or 1941
1942 or 1943
Personality Plus
1941
1945
Solid Gold
1940 or 1941
1943 or 1944
Ginny Simms
1942
1947
Hytone Joy
1942
1942 or 1943
Nightmare
1942
1945 or 1946
Checkerhall
1942
1946
Mighty Atom
1943
1948
Edith Fable
1943
1950
A Rarity
1946
1948
The Replica
1947
1950
Royal Daredevil
1947
1949 or 1950
*165 In addition to the show horses listed in the foregoing schedule, the petitioner bought and kept on hand some riding horses. During the period 1942 to 1953, inclusive, with the exception of "Oakhill Chief" and "Edith Fable," the petitioner bought show horses suitable for ladies and amateur classes in horse shows. During the period 1942 to 1953, inclusive, the petitioner had two locations for stabling his horses. The young, untrained show horses, trained show horses that had become unsound, retired show horses, and riding horses were kept at the petitioners' farm outside Portsmouth, Virginia. The petitioner conducted the training of these horses. The show horses that were being exhibited at the various horse shows were boarded and trained at Tulsa, Oklahoma, under the supervision of a professional trainer. An equal number of horses, on the average, was kept at the two locations varying between three and four horses at a time. The farm in Virginia was of sufficient area for breaking in and training previously untrained horses. The outbuildings on the farm consisted of an old stock barn located on the farm when purchased and one other barn that had been dismantled and rebuilt. There *166 were also several tenant houses on the farm. The petitioner hired one employee to assist in cleaning and bedding down the horses. In 1950 the petitioner hired two additional men, and their families occupied the tenant houses located on the farm. In addition to the outbuildings, the petitioner had other facilities for breaking in and training horses. He had some fenced-in areas to pasture the horses and a circle fence for training and exercise. The petitioner's participation regarding the breeding, training, and showing of horses during the period 1942 to 1953, inclusive, was primarily only supervisory in nature. The petitioner spent, on an average, between one to two hours a day and half days on Saturday and Sunday at the farm. In 1953, petitioner spent on the average about an hour more on weekdays at the farm than he had previously spent. The petitioner assisted in the training of the horses at the farm in Virginia but did none of the riding of the horses, nor did he do any of the showing of the horses. He did direct the breeding operation. During the period 1949 to 1953, inclusive, the petitioner's daughter did all of the actual riding and training of the young horses and unsound *167 ones located on the farm in Virginia. She had general direction of actual training of the young horses and restoration of the unsound horses. She spent every day, with the exception of Sunday, in riding the horses. She would arrive at the stable at 8:30 in the morning and would leave there no earlier than noon. The training of the horses was over every day at noon. The petitioner during the period 1942 to 1953, inclusive, bought untrained, semi-trained, and "finished horses." However, the petitioner did not make a purchase, with the exception of the horse "Feudist Knight," without the approval of his daughter. Jean had an extremely keen eye in making a selection. During the period 1942 to 1952, inclusive, the petitioner boarded horses of others only on very rare occasions. In 1953, the records of the horse operation show receipts of $1,100 in that year derived from boarding and training horses of others. There are no records to show what income, if any, was derived in prior years from this source. The petitioner did some breeding of show horses on his farm in Virginia prior to 1953. Three retired show mares and one brood mare given to the petitioner were reserved for breeding. *168 In 1948 the four mares were bred, and three colts were produced. One colt was born on the farm in Virginia in 1952. In addition to these four colts, the colt "Oakhill Sensation" was also bred and raised on the farm in Virginia. Jean McLean Davis did substantially all of the exhibiting of the petitioner's horses at the horse shows during the period 1942 to 1953, inclusive. She did all of the showing of the horses in the ladies and amateur divisions and frequently showed them in the Stake Classes. Jean drove the harness horse "The Encore" and rode the horse "Feudist Knight" in all events in which these horses were entered. She often showed the horses in open classes. Professional trainers rode the horses "Edith Fable" and "Oakhill Chief" that were shown most prominently during the years 1946 and 1947. Professional exhibitors were used when several horses of the petitioner were being exhibited at the same time. The rider's style in the showing of a horse at a horse show is the only factor a judge looks at in an equitation class, and may appeal to a judge and be of some determinative value on his award in other classes. Prior to 1953, the only record kept by the petitioner of the *169 expenses of the breeding, training, and showing of horses was a check book. Losses resulted from the operation during these years. A complete record of all the show horses that were exhibited each year was also kept. This latter record indicated the shows in which each horse was entered and the award won. Prior to and during 1953 the petitioner advertised his activities of breeding, training, and showing of horses in "The National Horseman" and "Short Snorts," publications involving show horses. The published articles concerning the petitioner's activities contained a picture of a horse or horses and a short statement of the achievement of the horse and horses and rider. The articles contained no statements or offers for the sale of show horses. Such articles are known as "paid publicity." Of the 11 horses pictured in the September 1953 issue of "The National Horseman" which were owned by the petitioner, five horses shown therein ("Edith Fable," "The Replica," "Feudist Knight," "A Rarity," and "Nightmare") had been sold or traded prior to the date of publication of the magazine. The petitioner's daughter got married in 1949. However, her interest and participation in the training *170 and showing of the petitioner's horses continued during the years following 1949, including the year 1953. The petitioner's daughter was not paid for her part in the breeding, training, and showing of horses of the petitioner in 1953. At the beginning of 1953, the petitioner owned the following show horses and devoted them to the use indicated: Name of Horse
Acquired by
Year
Age in 1953
Use
Oakhill Chief
Purchase
1943
16
Retired
The Sensation
Breeding
1948
5
Breeding
Moonlit Hour
Purchase
1944
13
Breeding
Mighty Fine
Purchase
1942
17
Breeding
Laurel of the Valley
Gift
1952
Breeding
A Sensation
Purchase
1944
17
Breeding
The Encore
Purchase
1948
7
Show
Twilight Walk
Purchase
1952
2
Show
Nemesis
Breeding
1952
1
Saturday's Hero
Breeding
1948
5
Show
Marilyn K.
Purchase
1952
3
Feudist Knight
Purchase
1942
14
Show
Oakhill Sensation
Breeding lSuperfine
Breeding
1948
5
During 1953, "Superfine" and "Feudist Knight" were traded for the show horse "Chief of El Do Don," "Saturday's Hero" was sold for $750, and "Oakhill Sensation" was traded to the trainer as payment for his training bill. "Chief of *171 El Do Don" was the junior, three-gaited champion of 1952 and the winner of the novice class prior to the time he was acquired by the petitioner. During 1953, four brood mares were bred but only three colts, "Kitty Kallen," "Matador," and "Moon Madness," were produced. During 1953, the petitioner's main show horse was "Chief of El Do Don." "The Encore" was also shown in 1953. However, "The Encore" was afflicted with an arthritic condition and was able to participate in shows only after a drug (cortisone) had been administered. The condition of "The Encore" was known only to the petitioner, his daughter, the trainer, and a veterinarian. During 1953, the petitioner let it be known to persons interested in buying "The Encore" that he was not for sale. During 1952 and 1953, the petitioners had an interest in the Sterling Point Corporation. This corporation was a farm in the Churchland area of Norfolk County, which area was subdivided and sold in lots. Either the petitioner or his wife was the president of Sterling Point Corporation. In the years immediately prior to 1953, the petitioners knew that Sterling Point Corporation would be liquidated in 1953. In 1953 the petitioners received *172 a liquidating dividend from the corporation in the amount of $76,728.79. The entire amount of this liquidating dividend was reported as a long-term capital gain on the petitioners' individual income tax return for 1953. The petitioner was not engaged in a trade or business of breeding, training, and showing of horses in 1953. Opinion Section 23(e) of the Internal Revenue Code of 1939 allows an individual engaged in a trade or business a deduction for losses incurred therefrom in computing net income for a taxable year provided such loss has not been compensated for by insurance or otherwise. A loss sustained from the operation of a business, such as a farm, if it is a separate business, may be deducted from gross income received from other sources provided the farm is not operated for recreation or pleasure. Regulations 118, Sec. 39.23(e)-5. It has been held in numerous cases that a farming activity devoted to the breeding, training, and racing of horses can be a trade or business and that such an activity devoted to the breeding, training, and showing of horses can also be a trade or business. There is no dispute here over the state of the law in this respect, and we deem *173 citation of the many authorities unnecessary. The question of whether the activities of the petitioners during 1953 in breeding, training, and showing of horses constituted a trade or business within the meaning of the statute depends upon whether such activities were for the purpose or with the intention of making a profit, provided the expectation of making a profit was reasonable. Hugenia S. Doggett, 23 B.T.A. (1931), revd. 65 F. 2d 191 (C.A.D.C. 1933) on the question of the reasonableness of the expectation. Whether the petitioners had the requisite intent to realize a profit from the operation is a question to be determined in each case upon the particular facts presented. See Israel O. Blake, 38 B.T.A. 1457 (1938). There is no dispute between the parties here that prior to 1953 the petitioner's show horse operation was not conducted as a trade or business but as a hobby primarily for the pleasure of petitioner's daughter. The petitioner contends that, at the beginning of 1953, he decided to convert the operation to a business, in large part because of his uncertainty over whether his daughter would continue her interest in showing horses. At *174 the trial, the petitioner testified that it was his intent in the taxable year to operate a business for profit. However, aside from his own statement to this effect, the evidence of such an intent is not convincing. It is true that a system of books was instituted by an accountant. The petitioner also testified that he spent about an hour more a day at the farm. However, despite minor variations, the entire record establishes that petitioner continued his overall operation of breeding, training, and showing horses in 1953 on substantially the same basis as in years before. On the basis of this record, the petitioner has failed to establish the existence of an intent to engage in the breeding, training, and showing of horses as a business for profit in 1953, and we have found as a fact that he was not so engaged. Decision will be entered for the respondent.